MAYAGÜEZ SUGAR COMPANY, INC., Plaintiff and Appellant, *v.* JUAN CARRERAS, ACTING TREASURER OF PUERTO RICO, Defendant and Appellee.

No. 8328. Argued December 4, 1941.—Decided January 16, 1942.

*Oscar Souffront* for appellant. *George A. Malcolm, Attorney General,* and *M. Rodríguez Ramos, Assistant Attorney General,* for appellee. *Hartzell, Kelley & Hartzell* and *Rafael O. Fernández* as *amici curiae.*

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

The Mayagüez Sugar Company, Inc., a corporation organized under the laws of Puerto Rico, paid under protest the sum of $903.39, collected from it by the Insular Treasurer as a ¼-cent tax per gallon on 361,355 gallons of molasses produced by it during the 1938–39 grinding season and sold by it to the Ponce firm of José Romaguera e Hijos for export.

After that payment had been made, said corporation brought an action against the Treasurer to recover the amount so paid, on the ground that no tax is imposed by said act on molasses where, as in this case, the same are sold for export.

The defendant by way of demurrer set up that the complaint did not state facts sufficient to constitute a cause of action.

The court heard the parties and sustained the demurrer for the reasons set forth in the opinion, and holding that the complaint could not be amended, it dismissed the same, with costs.

Feeling aggrieved by that decision, the plaintiff brought the present appeal.

Two errors are assigned by the appellant in its brief: First, that the court erred in deciding that Act No. 267 of 1938 (Session Laws, p. 497) levies a tax on molasses manufactured and sold in Puerto Rico for export and actually exported; and, second, that the court erred in rendering judgment without giving the plaintiff an opportunity to amend its complaint.

The Aguirre and Machete Centrals, through their attorneys Hartzell, Kelley & Hartzell, requested leave to appear as *amici curiae* (2 C. J. 1322), and the court granted their request. They appeared at the hearing of the appeal on November 12, 1941, and subsequently, on November 21, filed their brief. They argued in favor of the contention of the appellant. On the fourth of the following December, the appellee filed a reply brief to that of the *amici curiae* and the case was finally submitted.

The fundamental question for determination herein is the construction to be given to Section 1 of Act No. 267, *supra,* which literally transcribed reads as follows:

"Section 1.—By this Act there shall be levied, collected, and paid as an internal-revenue tax, once only, the sum of one-fourth ($\frac{1}{4}$) of a cent on each gallon of molasses brought into, or manufactured, sold, consumed, or otherwise disposed of for consumption in, Puerto Rico; and such tax shall be collected by the Treasurer of Puerto Rico through the affixing and canceling of internal-revenue stamps which he may prescribe for the purpose; *Provided, further,* That the said tax shall have the nature of an internal-revenue tax and shall, therefore, be uniform and general both for the article produced and brought to Puerto Rico and for the article manufactured or produced in this Island; and such tax shall be collected by the Treasurer of Puerto Rico subject to the provisions of the Internal

Revenue Act, as soon as such article is manufactured or produced in, or brought into, Puerto Rico, through the affixing and canceling of internal-revenue stamps on the documents prescribed for the purpose by the Insular Treasurer."

■■ Is the tax on molasses to be levied only on molasses to be consumed in Puerto Rico, as alleged by the appellant, or is the consumption thereof in Puerto Rico a limitation applicable only to such as is "otherwise disposed of" and not to the manufacture, sale, consumption or importation, as alleged by the appellee and upheld by the trial court, with the result that the tax may be assessed, irrespective of whether or not the molasses were sold to be consumed in the Island or to be exported?

A correct answer to the above question would amount to a just determination of the appeal.

Summing up the jurisprudence on the matter, we find the following in 59 C. J. 985:

"By what is known as the doctrine of the 'last antecedent,' relative and qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to or including other more remote. . . . . ."

Applying that rule to the instant case, it is obvious that, as the law provides that the tax in question is levied "on each gallon of molasses brought into, or manufactured, sold, consumed, or otherwise disposed of for consumption in Puerto Rico," the phrase "for consumption in Puerto Rico" is only applicable to the words immediately preceding, viz., "or otherwise disposed of" and not to the previous ones "brought into, or manufactured, sold, consumed."

The application of the above rule is, however, qualified by the decisions which, in this respect, are summarized in Corpus Juris, thus:

". . . . This rule is, however, merely an aid to construction and will not be adhered to where extension to a more remote antecedent is clearly required by a consideration of the entire act. Slight indication of legislative intent so to extend the relative term is sufficient.

Where several words are followed by a clause as much applicable to the first and other words as to the last, the clause should be read as applicable to all." 59 C.J. 985, 986.

Does a consideration of the entire act require that the qualification "for consumption in Puerto Rico" be applied to "brought into, or manufactured, sold, consumed?" Is there any indication of the legislative intent that might lead us to such a conclusion? Is the qualification as much applicable to the first words as to the last ones?

Let us consider the act as a whole so as to ascertain whether the same requires that the tax levied thereby should be limited to molasses consumed in Puerto Rico. It appears from its title and its preamble that the law was enacted because in the opinion of the Legislature malaria and uncinariasis constituted an impediment to the economic rehabilitation of Puerto Rico and should be combated and that, as no funds were available, the levy of a tax became necessary. Then follow five sections.

We know the first section. Section 2 creates from the proceeds of said tax a special fund called: "Fund to Combat Malaria and Uncinariasis, and to Assist the Insolvent Mothers and Abandoned Children who Constitute a Social Problem in this Island." Section 3 provides that the funds collected shall be expended by the Commissioner of Health with the approval of the Economy Commission in order to carry out the purposes of the act. Section 4 repeals all laws in conflict with the act, and section 5 prescribes that the act shall become effective from the date of its approval as being of an urgent nature.

Therefore, there is nothing therein requiring any restriction. Rather, from a further consideration of its preamble, it appears that a great sum of money is required for the proper execution thereof, inasmuch as it says: "In accordance with surveys made by the Insular Department of Health, 90 per cent of the persons residing in rural districts

in the upland municipalities are infected with the parasite of uncinariasis, and 40 per cent of the persons residing along the coast of the Island are infected with the malaria parasite," and it is a known fact that the population of Puerto Rico is close to two millions.

Nor does it appear from a consideration of the act that it was the legislative intent to exempt from taxation exported molasses. On the contrary, the proviso in section 1 expressly decrees that the tax "shall have the nature of an internal-revenue tax and shall, therefore, be uniform and general both for the article produced (abroad) and brought to Puerto Rico and for the article manufactured or produced in this Island; and such tax shall be collected . . . . *as soon as such article is manufactured or produced in, or brought into, Puerto Rico, . . . .*" (Italics ours.)

And if it is borne in mind that the Legislature itself in 1941 (Act No. 171, Session Laws, p. 1032) unequivocally showed its intent to tax all molasses, it must necessarily be concluded that such construction does not favor but rather prejudices appellant's proposition.

There only remains to be considered whether the condition is equally applicable to the last as well as to the first words of the act. Apart from the redundance resulting from the application of the condition "for consumption in Puerto Rico" to "consumption," it is unquestionable that it would apply to the other words involved, viz., "manufactured, sold, brought into." Hence, we must stop to consider the scope of the exemption.

The only jurisprudence cited in support of the last above-quoted excerpt from Corpus Juris is the decision of the Supreme Court of the United States in *Porto Rico Ry., Light & Power Co.* v. *Mor*, 253 U. S. 345, 64 L. Ed. 944. It is as follows:

"Mor, a subject of the King of Spain, domiciled in Porto Rico, brought in the United States District Court for Porto Rico this

action at law for an amount exceeding $3,000, exclusive of interest and costs, against the Porto Rico Railway, Light and Power Company, a Porto Rico corporation having its principal place of business there. Objection to the jurisdiction of the trial court was overruled and the plaintiff recovered judgment. The case came before the Circuit Court of Appeals for the First Circuit on writ of error and that court has presented to us by certificate the question whether the District Court had jurisdiction. The answer depends upon the construction to be given to the following provision contained in sec. 41 of the so-called Jones Act of March 2, 1917, c. 145, 39 Stat. 951, 965, which provides a civil government for Porto Rico:

" 'Said district court shall have jurisdiction of all controversies where all of the parties on either side of the controversy are citizens or subjects of a foreign State or States, or citizens of a State, Territory, or District of the United States not domiciled in Porto Rico, wherein the matter in dispute exceeds exclusive of interest or cost, the sum or value of $3,000 . . .'

"It is clear under this act that if Mor, instead of being a Spanish subject, had been a citizen of one of the United States, the court would not have had jurisdiction since he was domiciled in Porto Rico. The precise question, therefore, is whether the restriction of jurisdiction to cases where all the parties on either side of the controversy are 'not domiciled in Porto Rico' applies to aliens as well as to American citizens.

"The judicial system of Porto Rico prior to annexation to the United States comprised a Supreme Court and district trial courts of general jurisdiction and municipal courts. The proceedings in all of these courts were conducted in the Spanish language and according to the forms of the civil law. By sec. 33 of the Foraker Act, April 12, 1900, c. 191, 31 Stat. 77, 84, which established what was intended as a temporary civil government for the island, these insular courts were continued, with the proviso that the judges of the Supreme Court should be appointed by the President, and the judges of the inferior courts by the Governor. By sec. 40 of the Jones Act the jurisdiction of these courts and the forms of procedure in them were further continued.

"The 'District Court of the United States for Porto Rico' provided for by sec. 41 of the Jones Act was, in effect, a continuation of the district court of the United States provided for by sec. 34 of the Foraker Act, as amended by the Act of March 2, 1901, c. 812, sec. 3, 31 Stat. 953. Both acts conferred upon the court juris-

diction of all cases cognizable in circuit or district courts of the United States; the court is by both directed to proceed in the same manner as those courts; and in both there is an express provision that the pleadings and all proceedings shall be conducted in the English language. But the Jones Act greatly abridged the jurisdiction. The jurisdictional amount, which by the amendatory Act of March 2, 1901, had been lowered to $1,000, was raised to $3,000. And, whereas by the amendment of 1901 the court had been given jurisdiction in case either party was a citizen of the United States, even if he was domiciled in Porto Rico, the Jones Act limited the jurisdiction dependent on American citizenship to the cases where the Americans were not domiciled in Porto Rico. Whether it likewise limited jurisdiction dependent on alienage. is the question submitted to us.

"No reason appears why the clause 'not domiciled in Porto Rico' should not be read as applying to the entire phrase 'citizens or subjects of a foreign State or States, or citizens of a State, Territory, or District of the United States.' When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all. *United States* v. *Standard Brewery*, 251 U.S. 210, 218; *Johnson* v. *Southern Pacific Co.*, 196 U.S. 1, 18–19, and cases cited. Furthermore, special reasons exist for so construing the clause in question. The act manifests a general purpose to greatly curtail the jurisdiction of the District Court. If the application of the clause were doubtful, we should so construe the provision as to effectuate the general purpose of Congress. *American Security & Trust Co.* v. *District of Columbia*, 224 U.S. 491; *Inter-Island Steam Navigation Co.* v. *Ward*, 242 U.S. 1. But it seems to us clear that it applies alike to aliens and to American citizens.

"Suit may be brought in the District Court if either party has the jurisdictional qualifications; that is, the act confers upon such party not merely the right to sue but the liability to be sued. In the population of Porto Rico there are many aliens and these are largely Spaniards. If the limitation 'not domiciled in Porto Rico' were inapplicable to aliens, the result would work peculiar hardship and assuredly unintended discrimination against these Spaniards. A Spanish subject domiciled in Porto Rico might be sued by an American domiciled in Porto Rico or a Porto Rican in the District Court, where the proceedings are conducted in the English language and

according to the forms of Anglo-American law; whereas an American domiciled in Porto Rico could be sued only in the insular courts where the proceedings are conducted in the Spanish language and according to the procedure and processes of the civil law. This might not only prove very inconvenient to Spanish residents, but would be inconsistent with the spirit of the Article XI of the Treaty of 1898 between Spain and the United States (30 Stat. 1754, 1760), under which Spaniards residing in Porto Rico were guaranteed 'the right to appear before such courts, and to pursue the same course as citizens of the country to which the courts belong.'

"Congress could not have intended to give the District Court jurisdiction of any controversy to which a domiciled alien is a party while denying under similar circumstances jurisdiction where a domiciled American is a party.

"The question submitted is answered No."

We have transcribed in full the opinion of the Federal Supreme Court delivered by Mr. Justice Brandeis, because it not only establishes the exception to the grammatical rule of the last antecedent but also shows the necessity of its application in order to carry out the legislative intent. Such special circumstance, however, does not occur in the instant case.

█ The appellant insists that, as the question involved is one of construction of a tax statute, the latter should be construed in the sense most favorable to the taxpayer, and cites the case of *Gould* v. *Gould*, 245 U. S. 151, 153, wherein the U. S. Supreme Court held that—

"In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the Government, and in favor of the citizen. *United States* v. *Wigglesworth*, 2 Story, 369; *American Net & Twine Co.* v. *Worthington*, 141 U.S. 468, 474; *Benziger* v. *United States*, 192 U.S. 38, 55."

However, the above rule does not mean that where, as happens in this case, concerning the collection of a tax, the rule of the last antecedent agrees with the legislative intent,

the tax should not be levied because the law might be subject to another construction favorable to the taxpayer.

The U. S. Supreme Court itself, in *United States* v. *Stowell,* 133 U. S. 1, in an opinion delivered by Mr. Justice Gray, laid down the following doctrine:

"Statutes to prevent frauds upon the revenue, although they impose penalties or forfeitures, are not to be construed, like penal laws generally, strictly in favor of the defendant; but they are to be fairly and reasonably construed, so as to carry out the intention of the legislature."

The first of the errors assigned is nonexistent; and so is the second.

The district court passed upon all the questions set up in the complaint when deciding the demurrer. It did so very clearly, setting forth in its opinion the grounds for its decision. The plaintiff failed to ask for leave to amend its complaint or for a reconsideration of the judgment. It brought an appeal and the appellate court had·before it the same questions raised before the trial court and which we have just determined.

In *Vega et al.* v. *Rodríguez et al.,* 17 P.R.R. 239, this court said:

"When a court sustains a demurrer the case is for the moment decided and the winning party is entitled to a judgment unless the other party is given an opportunity to amend or take some other step. This opportunity may arise by the terms of the law, by the permission or concession of the court, given voluntarily or at the instance of the losing party, or such opportunity may perhaps arise from some agreement or stipulation of the parties."

In *Bancroft's Code Pleading,* vol. 1, par. 542, p. 785, we find the following:

"Where a demurrer to a complaint is sustained in the court below, the plaintiff declines to amend, and appeals from the judgment and the order sustaining the demurrer, the supreme court, if it affirm the judgment, may not grant plaintiff leave to amend his complaint."

726

We have examined the proposed amendments and we are not convinced that they would change the result. We say this, of course, without prejudice to any final disposition of the same. Our decision that this particular case should not be reopened rests on the *prima facie* impression made upon us by said questions and the attendant circumstances of the case.

In virtue of all the foregoing, the appeal must be denied and the judgment appealed from affirmed.

Mr. Justice Snyder took no part in the decision of this case.